NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 15-1505
_____

UNITED STATES OF AMERICA

v.

CYNTHIA EVETTE BROWN,
Appellant

_____

Nos. 15-1531
_____

UNITED STATES OF AMERICA

v.

WALTER ALSTON BROWN, JR.,
Appellant


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. Nos. 2-13-cr-00176-004 and 2-13-cr-00176-005)
District Judge: Hon. Berle M. Schiller

Submitted Under Third Circuit LAR 34.1(a)
July 14, 2016

BEFORE: FUENTES,** SHWARTZ, and BARRY, Circuit Judges

(Opinion Filed: August 16, 2016)

_____

OPINION*

_____

FUENTES, <u>Circuit Judge</u>

Cynthia and Walter Brown appeal their criminal sentences stemming from their involvement in a mortgage fraud scheme. For the reasons that follow, we will affirm in part and vacate in part.

## I. BACKGROUND

Walter and Cynthia Brown were heavily involved in a group that used a multifaceted scheme to lie to banks, obtain mortgage loans as a result of their misrepresentations, and squander the loan money.

The mortgage fraud scheme was complex and elaborate, and we address only the salient details. Between May 2004 and December 2009, Walter and Cynthia participated in a conspiracy to obtain fraudulent mortgage loans using straw borrowers and false personal information. The scheme also included co-conspirators who were mortgage brokers, home developers, settlement agents, appraisers, and accountants. The members of the conspiracy would receive loans that far exceeded the price of the properties, the majority of which were distressed and located in West Philadelphia. The co-conspirators would then either purchase the properties and take a profit based on the difference

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
** Honorable Julio M. Fuentes assumed Senior Status on July 18, 2016.

2

between the loan and the property value or simply pocket the money from the loan altogether.

As the conspiracy grew, the co-conspirators formed their own title agency called KREW Settlement Services (an acronym for the first names of the company's owners). This company was involved in many of the conspiracy's fraudulent mortgage loans. In all, the scheme caused lenders to sustain actual losses of more than $7 million.

Walter and Cynthia each played distinct roles based upon their experience and knowledge in the mortgage industry. Walter was a mortgage broker who was based in Virginia, and a co-owner of KREW. He used his position as a mortgage broker to process fraudulent loans for properties, which were identified by members of the conspiracy and purchased using straw borrowers. Walter's role in the scheme was heavily based on preparing the mortgage applications and providing the necessary income statements and appraisals, all of which were false. As payment for his role in the conspiracy, he received cash from his cousin and co-conspirator, which he failed to report on his tax returns.

Cynthia also played an essential role in this conspiracy. She was employed as an administrative assistant in the Human Resources Department at Unicco Service Company. By no coincidence, the place of employment listed on many of the straw buyers' applications was Unicco. On many occasions the banks would call Cynthia to confirm that a straw buyer did, in fact, work at Unicco and that the reports regarding their income were accurate. In response to their questions, Cynthia would confirm the false

3

information on the loan applications. These false confirmations were essential for the co-conspirators in receiving fraudulent loans.

Following an investigation by the FBI into the scheme, on April 11, 2013, a federal grand jury in Philadelphia returned a 34-count indictment charging the co-conspirators variously with conspiracy to commit loan and wire fraud, in violation of 18 U.S.C. § 371; false statements in connection with an FHA loan, in violation of 18 U.S.C. § 1010; loan fraud, in violation of 18 U.S.C. § 1014; aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); wire fraud, in violation of 18 U.S.C. §§ 1343, 1349; filing false tax returns, in violation of 26 U.S.C. § 7206(1); tax evasion, in violation of 26 U.S.C. § 7201; and aiding and abetting certain of these crimes, in violation of 18 U.S.C. § 2. In total, Walter faced 10 criminal charges and Cynthia faced 8.

Following a jury trial, Defendants were convicted of all of the counts with which they were charged and sentenced to 180 months' imprisonment. In addition, Cynthia was ordered to pay $7,488,608 in restitution, while Walter was ordered to pay $7,213,123 in restitution and an additional $31,903 to the IRS. The court also imposed a "money judgment" forfeiture against Cynthia in the amount of $7,418,303, representing the proceeds of the offenses of conviction.

This appeal followed.

## II.   DISCUSSION[1]

---

[1] The District Court had jurisdiction over the case pursuant to 18 U.S.C. § 3231. We have jurisdiction over this matter under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The parties present several arguments, which we will address in turn. The 2013 indictment in Walter's case charged the submission of fraudulent loan applications to FDIC-insured lenders under 18 U.S.C. § 1014. The version of § 1014 in effect in March 2008 prohibited knowingly making "any false statement or report, or willfully overvalu[ing] any land, property or security, for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation . . . ."[2] The statute did not cover false statements made to non-FDIC-insured mortgage lending businesses. In 2009, the statute was amended to include non-FDIC-insured mortgage lending businesses.[3]

Walter first claims his conviction under this statute constitutes an *ex post facto* violation because the fraudulent acts for which he was convicted ended in 2008 and involved both FDIC and non-FIDC-insured banks. Walter never raised this argument at trial, so we review for plain error.[4]

We reject Walter's argument. The 2008 version of the statute explicitly prohibited knowingly making false statements to institutions insured by the FDIC. The institutions Walter was charged with defrauding were all insured by the FDIC. Thus, Walter was properly charged and convicted under either version of the statute.[5]

---

[2] 18 U.S.C. § 1014 (2008 ed.).
[3] Pub. L. 111-21 § 2(c), 123 Stat. 1617.
[4] *United States v. Boone*, 279 F.3d 163, 174 n.6 (3d Cir. 2002).
[5] Walter further claims that the 2008 version of the statute was vague and ambiguous. This claim is equally baseless. There was nothing vague about the fact that it was illegal to make false statements to FDIC-insured institutions.

Next, Walter claims that the evidence did not sufficiently prove he knowingly participated in the loan fraud scheme. We also review sufficiency of evidence claims not raised at trial for plain error.[6] Here, Walter argues that his contribution was "ministerial" in nature and that he was only inputting and forwarding data to banks without being aware of the consequences of the scheme. Again, we find Walter's argument to be unavailing. The evidence at trial firmly established Walters' central role in the scheme. Numerous witnesses testified as to Walter's knowing participation in the fraud. He was a part owner of the shell company used to facilitate crime. He even submitted his own resume as part of the fraudulent loan application packages. In short, the evidence proving his guilt beyond a reasonable doubt was more than sufficient.

In addition, both Defendants claim that the indictment was constructively amended as a result of certain statements made during the government's closing arguments and the District Court's jury instructions. Specifically, they claim that the jury was not instructed or told which false statements related to which counts. Among other things, the District Court allowed the government to provide the jury with a chart containing various alleged false statements made in connection with loan applications for each property. However, the statements on the chart were not in every case described in the indictment. And, the court did not give the jury the original indictment for their deliberation when they asked for it. Therefore, Defendants claim that the bases on which

---

[6] *United States v. Gordon*, 290 F.3d 539, 547 (3d Cir. 2002).

the jury could have convicted them were improperly broadened beyond the allegations asserted in the indictment and that their convictions and sentences should be vacated.

If the charges in the indictment were constructively amended, there is a presumption that the constructive amendment violated a substantial right of the defendants.[7] However, the government can rebut this presumption by showing that the constructive amendment did not affect a defendant's substantial rights.[8]

We have reviewed the record thoroughly and find that the government's chart did not improperly broaden the basis upon which the jury could have found Walter or Cynthia guilty of the mortgage fraud counts of which they were convicted, nor did the government's closing argument or the jury instructions. We believe that, here, the evidence and arguments at trial "concerned the same elaborate scheme to defraud" described in the indictment.[9] This suggests to us that any discrepancy between the challenged counts and what the jury saw and heard at trial represented a variance rather than a constructive amendment.[10] We believe, further, that any such variance did not prejudice the defense.[11] Accordingly, we will affirm the counts of conviction.[12]

---

[7] *United States v. Syme*, 276 F.3d 131, 154-55 (3d Cir. 2002).

[8] *Id.*

[9] *See United States v. Dupre*, 462 F.3d 131, 140-41 (2d Cir. 2006).

[10] *Id.*

[11] *See United States v. Daraio*, 445 F.3d 253, 262 (3d Cir. 2006) ("Unlike a constructive amendment, a variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense.").

[12] We acknowledge that the government conceded error with respect to Cynthia's Count 5 conviction. However, we are not bound to accept the government's concession and decline to do so here. *See United States v. Ginyard*, 444 F.3d 648, 649 (D.C. Cir. 2006) ("Although the United States has conceded error, the court is not bound by that

The government concedes that it included $69,776 in losses for an entity that was not covered under the criminal restitution statute when it calculated the restitution order against Cynthia. After careful consideration, we agree that this amount was improperly included in the total restitution calculation and should therefore be vacated. We therefore find that the $69,776 should be deducted from Cynthia's overall restitution penalty. We decline to remand to the District Court for any recalculation or resentencing.[13]

## III.   CONCLUSION

For the foregoing reasons, we will vacate the restitution order issued against Cynthia in the amount of $69,776 and otherwise affirm the sentences imposed by the District Court.

---

concession on a question of law."); *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) ("Even if a concession is made by the government, we are not bound by the government's erroneous view of the law.") (citation and internal quotation marks omitted).

[13] We have carefully reviewed all of Defendants' remaining arguments, including those regarding the applicable statute of limitations, prejudicial spillover, and the alleged multiplicitous indictment. In short, we find them to be without merit.